Nelson v. Alliance Hospitality Mgmt., LLC, 2011 NCBC 42.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 3217

KENNETH E. NELSON,

         Plaintiff,

    v.

ALLIANCE HOSPITALITY
MANAGEMENT, LLC, a Georgia
limited liability company, ROLF
A. TWEETEN, and AXIS
HOSPITALITY, INC., an Illinois
corporation,

         Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION TO DISMISS**

{1} THIS MATTER is before the Court on cross-motions to dismiss pursuant to Rule 12 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, the Court concludes that Defendants' motion is GRANTED in part and DENIED in part and that Plaintiff's motion is DENIED.

*Meynardie & Nanney, PLLC by Joseph H. Nanney and Moore & Van Allen PLLC by William E. Freeman and Michael J. Byrne for Plaintiff/ Counterclaim Defendant Kenneth E. Nelson.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P. by Michael W. Mitchell and Jackson W. Moore, Jr. for Defendants/Counterclaim Plaintiffs Alliance Hospitality Management, LLC, Rolf A. Tweeten, and Axis Hospitality, Inc.*

Gale, Judge.

# I. INTRODUCTION

{2} This case arises out of Plaintiff/Counterclaim-Defendant Kenneth E. Nelson's ("Nelson") employment with and ownership interest in Defendant/ Counterclaim-Plaintiff Alliance Hospitality Management, LLC ("Alliance"). Nelson contends that Defendants/Counterclaim-Plaintiffs Axis Hospitality, Inc. ("Axis") and Rolf A. Tweeten ("Tweeten") secretly negotiated the sale of substantially all of Alliance's assets and wrongfully withholds his proportionate share of the proceeds. Nelson asserts claims for breach of fiduciary duty, dissolution, constructive fraud, declaratory judgment, and breach of contract/wrongful termination. Defendants' motion seeks to dismiss all of Nelson's claims except for declaratory judgment.

{3} Defendants dispute both the validity and the extent of the ownership interest Nelson claims in Alliance. They allege that Nelson obtained his purported interest through misrepresentation and/or fraud and further that he can no longer be a member because he is insolvent. In their counterclaim, Defendants assert claims for declaratory judgment, reformation, negligent misrepresentation, constructive fraud, breach of fiduciary duty, and injunctive relief. Plaintiff's motion seeks to dismiss Defendants' claims for constructive fraud and negligent misrepresentation.

{4} Accepting all facts as true, as the Court must, Nelson's Complaint states valid causes of action for breach of fiduciary duty, dissolution, and constructive fraud but omits key assertions necessary to state an actionable claim for breach of contract/wrongful termination. Defendants state valid causes of action for constructive fraud and negligent misrepresentation. Accordingly, only Nelson's claim for breach of contract/wrongful termination should be dismissed. There are many issues that may later be appropriate for summary disposition after discovery, but those issues cannot be decided upon an initial motion to dismiss pursuant to Rule 12(b)(6).

## II. PROCEDURAL BACKGROUND

{5} Nelson filed his Complaint in Alamance County Superior Court on February 25, 2011 and his Amended Complaint on June 1, 2011. The matter was designated as a Complex Business Case by Order of Chief Justice Sarah Parker dated March 22, 2011 and subsequently assigned to this Court by Order dated March 24, 2011. Defendants filed their Answer and Counterclaim on February 28, 2011 and their Second Amended Counterclaim on July 11, 2011. On July 29, 2011, Nelson filed his Motion to Dismiss pursuant to Rule 12(b)(6) ("Plaintiff's Motion"). That same day, Defendants filed their Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) ("Defendants' Motion"). The motions have been fully briefed, the Court heard oral arguments, and the matter is ripe for disposition.

## III. STATEMENT OF FACTS

{6} The following facts are taken from the pleadings and documents they incorporate,[1] construed favorably to the moving party with permissible inferences not inconsistent with the alleged facts.

{7} Nelson is a citizen and resident of Cary, Wake County, North Carolina, and former Chief Financial Officer[2] and manager-director of Alliance. Alliance is a Georgia limited liability company with a principal place of business in Wake County, North Carolina that provides third-party hospitality management services to hotels throughout the United States. Tweeten is a citizen and resident of Raleigh, Wake County, North Carolina and the sole owner of Axis. Axis is an Illinois corporation with a principal place of business in Wake County, North Carolina. Axis is the majority interest holder in Alliance.

---

[1] Documents referenced in and attached to the pleadings can be considered on a motion to dismiss without converting a Rule 12(b)(6) motion into a motion for summary judgment. *See Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 255, 580 S.E.2d 757, 759 (2003); *Tomlin v. Dylan Mortgage, Inc.*, 2000 NCBC 9, fn. 1 (N.C. Super. Ct. June 12, 2000), http://www.ncbusinesscourt.net/opinions/ 2000%20NCBC%209.htm.

[2] Nelson was Chief Financial Officer of Alliance from sometime in 2009 until January 31, 2011, and was a manager-director of Alliance from August 2007 until January 19, 2011. (Am. Compl. ¶¶ 43, 45; Second Am. Countercl. ¶ 6.) Nelson also served as Vice-President of Axis for a period not alleged, but beginning sometime in or before 2010. (Second Am. Countercl. ¶¶ 6–7.)

{8}  In 2007, Tweeten, through Axis, purchased a majority interest in Alliance.  (Am. Compl. ¶ 21.)  Prior to doing so, Tweeten contacted Nelson and requested his help in managing the operations of Alliance.  (Am. Compl. ¶ 22.)  Nelson agreed, and became a member of Alliance's board of directors in August 2007.  (Am. Compl. ¶¶ 22– 23.)  At that time, Alliance was owned and managed by Axis, Tweeten, and Keith Hansen ("Hansen"), Alliance's former Chief Financial Officer.

{9}  In January 2008, Tweeten promised Nelson a twenty percent (20%) ownership interest in Alliance.  (Am. Compl. ¶ 25.)  Tweeten later asked if the twenty percent (20%) interest could be reduced to ten percent (10%), and Nelson agreed to the reduction.  (Am. Compl. ¶ 26.)  Effective February 28, 2008, Axis, Tweeten, and Hansen executed an Amended and Restated Operating Agreement of Alliance Hospitality Management, LLC ("Operating Agreement") setting forth the "Membership Percentage Interests" and membership "Units" in Alliance.  (Pl.'s Br. in Supp. of Mot. to Dismiss ("Pl.'s Supp. Br.") Ex. 1 at 26–27.)  At that time, there were one hundred (100) outstanding membership units with each unit representing a one percent (1%) ownership interest.  Tweeten held twenty-nine (29) ownership units; Axis held fifty-one (51) ownership units; and Hansen held twenty (20) ownership units.  In March 2008, Alliance purchased Tweeten's twenty-nine (29) units reducing the number of outstanding units to seventy-one (71); fifty-one (51) of which were owned by Axis and the remaining twenty (20) by Hansen.  (Am. Compl. ¶¶ 28–29.)

{10}  During 2007 and 2008, Nelson worked part-time for Alliance while commuting between Milwaukee, Wisconsin and Raleigh, North Carolina.  (Am. Compl. ¶ 30.)  In early 2009, Tweeten convinced Nelson to move to North Carolina and increase his participation in Alliance's management.  (Am. Compl. ¶ 30.)  Nelson agreed to relocate but insisted on the execution of a written document evidencing his ownership interest in Alliance.  (Am. Compl. ¶ 31.)

{11}  Between May 28, 2009 and June 3, 2009, Tweeten and Nelson had numerous conversations regarding Nelson's ownership interest in the company.

(Am. Compl. ¶ 31.)  The Parties each acknowledge that these conversations took place, but they disagree as to the extent of Nelson's contemplated ownership interest.  Nelson contends that Tweeten authorized an ownership interest of ten (10) *membership units*, which equates to sixteen and four-tenths percent (16.4%), and Tweeten contends that he authorized an ownership interest of ten *percent* (10%).[3]

{12}  On June 3, 2009, Tweeten and Nelson executed a Consent Resolution indicating that Alliance would issue ten (10) membership units to Nelson as compensation for his ongoing management services.  (Am. Compl. ¶ 32.)  Nelson then left his home in Wisconsin and moved to Cary, North Carolina.  (Am. Compl. ¶ 33.)  Those units were not actually issued at that time.

{13}  In April 2010, Alliance purchased Hansen's ownership interest leaving sixty-one (61) membership units outstanding.  (Am. Compl. ¶ 34.)  On September 24, 2010, Nelson presented Tweeten with a document entitled Admission of Member ("Admission Document") which purports to grant an ownership interest of ten (10) units to Nelson.  (Pl.'s Supp. Br. Ex. 1.)  The Admission Document provides an effective date of March 23, 2010.

{14}  Defendants contend Nelson presented the Admission Document to Tweeten as a document that had to be executed immediately so that Nelson could renew certain state licenses that Alliance needed in order to continue its hotel management operations.  (Second Am. Countercl. ¶ 31.)  Tweeten contends he signed the Admission Document without being given an opportunity to read it or investigate its legal effect given the urgency presented by Nelson.  (Second Am. Countercl. ¶ 31.)  Tweeten further asserts that he could not have learned the true facts surrounding the execution of the Admission Document through the exercise of due diligence.  (Second Am. Countercl. ¶ 31.)  Nelson counters that there was nothing misleading about the clear language of the document, which Tweeten must be presumed to have read.

---

[3] While Defendants claim Nelson cannot be a member because of his insolvency, they admit he holds an ownership interest in Alliance.

{15} In early 2010, Tweeten and Nelson discussed the possibility of either merging Alliance with another company, or selling substantially all of its assets. (Am. Compl. ¶ 37.) Interstate Management Company, LLC ("Interstate") was considered a potential purchaser and Tweeten and Nelson actively pursued it as such. (Am. Compl. ¶ 41.) Negotiations were ongoing during most of 2010, and Tweeten and Nelson regularly communicated regarding the future of Alliance. (Am. Compl. ¶ 38.)

{16} On November 19, 2010, Tweeten halted all negotiations and informed Nelson that Alliance would not be sold. (Am. Compl. ¶ 39.) He then offered to purchase Nelson's ownership interest at a price substantially below what Nelson believed to be fair value. (Am. Compl. ¶ 40.)

{17} After November 19, 2010, Nelson alleges that without his knowledge or participation, Tweeten secretly continued to negotiate the sale of a substantial part of Alliance's assets to Interstate. (Am. Compl. ¶ 42.)

{18} On January 19, 2011, Tweeten took action intended to remove Nelson as an Alliance director. (Am. Compl. ¶ 43.) On or about January 28, 2011, Tweeten, on behalf of Alliance, executed a contract with Interstate for the sale of a substantial part of Alliance's assets. (Am. Compl. ¶ 44.) On January 31, 2011, Tweeten took action intended to terminate Nelson as Alliance's Chief Financial Officer. (Am. Compl. ¶ 45.) Within a week of Nelson's termination, Tweeten informed him of the pending sale to Interstate. (Am. Compl. ¶ 46.)

{19} The transaction between Alliance and Interstate closed on or about April 1, 2011. (Am. Compl. ¶ 47.) Under the terms of the sale, Alliance was paid some monies at closing, with additional funds to be paid in installments over a two (2) year period.[4] (Am. Compl. ¶ 48.)

{20} Prior to the sale, Alliance managed approximately fifty (50) hotels but as a result of the Interstate Transaction, that number has been reduced to approximately seventeen (17). (Am. Compl. ¶¶ 49–50; Second Am. Countercl. ¶ 5.) Despite the substantial reduction in size, Tweeten has refused to distribute any of

---

[4] The exact terms of the transaction have not been publicly disclosed.

the Interstate proceeds to Nelson asserting that Alliance has elected to retain the proceeds as operating capital.

{21} Nelson alleges that he was squeezed out as the minority interest holder in Alliance so that Tweeten could reap the entire benefit of the Interstate transaction and that Tweeten's claim of holding the funds as capital is pretextual. Tweeten contends that Nelson was removed as a director and the Chief Executive Officer of Alliance due to his alleged insolvency[5] and his "failure to devote his time to the business of Alliance and Axis." (Am. Countercl. ¶ 42.)

## IV. STANDARD OF REVIEW

{22} The standard for a Rule 12(b)(1) motion is discussed below. The appropriate Rule 12(b)(6) standard is well established. *See, e.g., Sutton v. Duke,* 277 N.C. 94, 102–03, 176 S.E.2d 161, 166 (1970); *Crouse v. Mineo,* 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008); *Harris v. NCNB Nat'l Bank of N.C.,* 85 N.C. App. 669, 670–71, 355 S.E.2d 838, 840–41 (1987).

## V. ANALYSIS

### A. Defendants' Motion to Dismiss

{23} Defendants' Motion attacks Nelson's standing to assert claims for breach of fiduciary duty and dissolution under Rule 12(b)(1) and seeks dismissal of Nelson's claims for breach of fiduciary duty, dissolution, constructive fraud, and breach of contract/wrongful termination under Rule 12(b)(6).

#### 1. Breach of Fiduciary Duty and Dissolution Claims

a.    The Standing Issue

{24} Defendants acknowledge that Nelson has standing to assert some claims but attack his breach of fiduciary duty and dissolution claims under Rule 12(b)(1) on the basis that such claims belong only to a member of Alliance.

---

[5] As discussed more fully below, Axis, Tweeten and Alliance claim that Nelson was insolvent during 2009, 2010, and 2011. Defendants contend this insolvency caused Nelson to forfeit his interest as a member and manager of Alliance. Accepting all of Defendants' allegations, there is also a question whether Nelson was insolvent before he was made a member.

{25} "Standing refers to whether a party has a sufficient stake in an otherwise justiciable controversy such that he or she may properly seek adjudication of the matter." *Morris v. Thomas*, 161 N.C. App. 684, 684, 589 S.E.2d 419, 422 (2003) (citing *Am. Woodland Indus., Inc. v. Tolson*, 155 N.C. App. 624, 626, 574 S.E.2d 55, 57 (2002), *disc. review denied*, 357 N.C. 61, 579 S.E.2d 283 (2003)). It is "a necessary prerequisite to a court's proper exercise of subject matter jurisdiction" and a question of law for the court. *Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878–79, *disc. review denied*, 356 N.C. 610, 574 S.E.2d 474 (2002); *See Creek Pointe Homeowner's Ass'n v. Happ*, 146 N.C. App. 159, 165, 552 S.E.2d 220, 225 (2001), *review denied*, 356 N.C. 161, 568 S.E.2d 191 (2002). "[P]laintiffs have the burden of proving that standing exists," *Tolson*, 155 N.C. App. at 627, 574 S.E.2d at 57, but "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Neuse River Found., Inc. v. Smithfield Foots, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002).

{26} The North Carolina Court of Appeals has indicated that "[s]tanding . . . is . . . properly challenged by a Rule 12(b)(6) motion to dismiss." *Fuller v. Easley*, 145 N.C. App. 391, 395, 553 S.E.2d 43, 46 (2001); *Energy Investors Fund, L.P. v. Metric Constructors Inc.*, 351 N.C. 331, 337, 525 S.E.2d 441, 445 (2000). Standing may also be challenged under Rule 12(b)(1). "Standing is treated differently than most other issues because it is an aspect of subject matter jurisdiction. In determining the issue of subject matter jurisdiction on a motion to dismiss, the Court is not restricted to the face of the pleadings in making its determination." *Transcontinental Gas Pipe Line Corp. v. Calco Enters.*, 132 N.C. App. 237, 241, 511 S.E.2d 671, 675 (1999).

{27} Defendants contend that Nelson lost his member status and his ability to assert claims for breach of fiduciary duty and dissolution as a result of insolvency under Section 4.6 of the Operating Agreement which provides:

4.6 <u>Bankruptcy or Incapacity of a Member</u>. A member shall cease to have any power as a Member or Manager, any voting rights or rights of approval hereunder upon death, bankruptcy, insolvency, dissolution, assignment for the benefit of creditors, or legal incapacity; and each Member . . . upon the occurrence of any such event shall have only the rights, powers, and privileges of a transferee enumerated in Section 8.4 and shall be liable for all obligations of such Member under this Agreement.

. . . .

8.4 <u>Rights of Transferee</u>. Unless admitted to the Company in accordance with Section 8.3, the transferee of a Membership Interest or a part thereof shall not be entitled to any of the rights, powers, or privileges of its predecessor in interest, except that such transferee shall be entitled to receive and be credited or debited with its proportionate share of Profits, Losses, Gains from Capital Transactions, Company Cash Flow, Company Sales Proceeds, Company Refinancing Proceeds, and Distributions in liquidation.

(Defs.' Br. in Supp. of Mot. to Dismiss ("Defs.' Supp. Br.") Ex. B §§ 4.6, 8.4.)

{28} "Insolvency" is not a defined term under the Operating Agreement, but in support of their standing argument, Defendants offer (1) a document evidencing a $797,615.00 judgment against Nelson in favor of Orlando Residence Ltd. ("Orlando") from the year 2000; (2) a 2008 Wisconsin order requiring Mr. Nelson and his wife to turn over assets worth more than $1,100,000.00; (3) a 2011 motion filed by Orlando seeking the assignment of a $4,000,000.00 judgment entered against Nelson in South Carolina and a $1,818,418.00 judgment entered against Nelson in Oklahoma; (4) a UCC-1 dated September 20, 2010 purporting to grant Nelson's wife a security interest in all of his personal property; (5) a Wake County Superior Court Charging Order dated May 11, 2011 made against Nelson's interest in Alliance in the amount of $121,127.85 to satisfy the Orlando judgment; and (6) a Wisconsin order on an unsuccessful motion to dismiss filed by Nelson against Orlando in an attempt to prevent Orlando from foreclosing on his personal residence in Wisconsin. (Defs.' Supp. Br. Ex. C–H.)

{29} While these documents indicate that Nelson has substantial outstanding financial obligations, the evidence is insufficient to establish insolvency as a matter

of law. There is no evidence before the Court quantifying Nelson's monetary assets or demonstrating his conclusive inability to pay his debts as they come due. While the documentary evidence that Nelson has not paid debts may support an inference that Nelson is insolvent, the evidence also supports an inference that Nelson has made a conscious decision not to satisfy those judgments. These competing inferences create questions of material fact. It is also premature to compare his liabilities to his assets that may include the value of his ownership interest in Alliance.

{30} The record evidence is insufficient to adjudicate insolvency as a matter of law and Nelson has at least an adequate stake in the case to assume the vigorous prosecution of his claims. Defendants' Motion with respect to Nelson's standing to assert claims for breach of fiduciary duty and dissolution is DENIED without prejudice to the Court's ability to revisit the issue on a more fully developed factual record.

b.      The Merits of the Breach of Fiduciary Duty Claim

{31} Even assuming that Nelson has standing to assert the claim, Defendants contend that Nelson has failed to state a claim for breach of fiduciary duty because the Operating Agreement narrowly limits the fiduciary duties owed to Nelson and the Amended Complaint fails to allege facts suggesting that Alliance's decision to maintain the proceeds of the Interstate Transaction is not in the best interest of Alliance. (Defs.' Supp. Br. 9.)

{32} The Operating Agreement provides that it "shall be governed and construed in accordance with the laws of the State of Georgia without giving effect to the conflicts of laws provisions thereof." (Defs.' Supp. Br. Ex. B § 11.10.)

{33} Under Georgia law, "[a] member or manager [of a limited liability company] shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." O.C.G.A. § 14-11-305(1) (2011). But, to the extent that a member or manager "has duties

(including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager:"

> (A) The member's or manager's duties and liabilities may be expanded, restricted, or eliminated by provisions in the articles of organization or a written operating agreement; provided, however, that no such provision shall eliminate or limit the liability of a member or manager:

> (i) For intentional misconduct or a knowing violation of the law; or

> (ii) For any transaction for which the person received a personal benefit in violation or breach of any provision of a written operating agreement . . . .

O.C.G.A. §§ 14-11-305(4)−(4)(A)(ii) (2011).

{34} In the "Exculpation" section, the Operating Agreement limits fiduciary duties owned by members or managers "to the fullest extent provided by law" stating:

> no Director shall be liable, responsible or accountable in damages or otherwise to the Company or to any Member for any act or omission performed or omitted by such Director (other than a willful misconduct involving self dealing) whether in his capacity as Director or otherwise. To the extent that, at law or in equity, a Director has duties (including fiduciary duties) and liabilities related thereto to the Company or to any Member, it is expressly agreed by the Members that such liabilities and duties shall be deemed eliminated (other than liabilities arising out of a lawful misconduct involving self dealing), and if elimination is not allowed by applicable laws, they should be deemed limited to the fullest extend permitted by applicable laws.

(Defs.' Supp. Br. Ex. B § 3.7.)

{35} As a result of the Exculpation clause, Nelson can only prevail on his claim for breach of fiduciary duty if he can demonstrate in evidence, and taking into consideration the business judgment rule, that the withholding of the Interstate proceeds does not advance a business interest of Alliance and is an act of "willful misconduct involving self-dealing" taken solely for the benefit of Axis or Tweeten.

{36} To carry this burden, the Amended Complaint alleges that Axis and Tweeten owe fiduciary duties to Nelson (Am. Compl. ¶¶ 55–56); Nelson made demand on Alliance, Axis, and Tweeten to release the excess funds from the Interstate Transaction and that request was denied (Am. Compl. ¶¶ 61–62); "although Axis and Tweeten purport to act in the best interest of Alliance, in fact they are acting in their own best interests, to the detriment of Nelson" (Am. Compl. ¶ 63); "Axis and Tweeten are breaching their fiduciary duties to Nelson by using their position as controlling owners to the detriment of Nelson, by refusing to protect his reasonable expectations, and by using Alliance to further their own interests, to the detriment of Nelson" (Am. Compl. ¶ 66); and "Defendants are aware of the harm they are causing Nelson, and continue to act in complete disregard for Nelson's rights . . . cooperating with Nelson's creditors, hoping to use the threat of great harm to Nelson to benefit themselves by forcing Nelson to accept less from Alliance than he is entitled to receive." (Am. Compl. ¶ 69.)

{37} The Court questions whether in any event Tweeten individually can be said to owe fiduciary duties to Nelson, as opposed to Axis. The Court is frankly doubtful that Nelson will ultimately be able to sustain his burden of proof at trial, or even to survive a motion for summary judgment. But Nelson has pled that the withholding of the sales proceeds serves no business purpose, and these allegations mean that Nelson survives the motion to dismiss utilizing North Carolina's lenient Rule 12(b)(6) standard. The Court is not certain the pleadings could survive the more rigorous federal Rule 12(b)(6) standard. FED. R. CIV. P. 12(b)(6).

{38} Defendants' Motion on this ground is DENIED.

c.  The Merits of the Dissolution Claim

{39} Defendants contend that Nelson has failed to state a claim for dissolution because dissolution of a Georgia limited liability company is proper only where permitted by "applicable statute or by the company's operating agreement" and neither authorizes dissolution here. (Defs.' Supp. Br. 15.)

{40} Under Georgia law, a limited liability company may be judicially dissolved "[o]n application by or for a member . . . whenever it is not reasonably

practicable to carry on the business in conformity with the articles of organization or a written operating agreement." O.C.G.A. § 14-11-603(a) (2011).

{41} Nelson's counsel again admits a high burden to prove that there is no reasonable basis to believe that Alliance can accomplish its business purposes. The Amended Complaint alleges that "[t]he sale of assets to Interstate has made it impossible for Alliance to continue to operate at a profit" (Am. Compl. ¶ 96); "[a]ny election to continue the business of Alliance after the Interstate sale was made in bad faith" (Am. Compl. ¶ 97); and "[i]t is not reasonably practicable to carry on the business of Alliance in conformity with the articles of organization or a written operating agreement." (Am. Compl. ¶ 100.)

{42} Nelson's burden may again ultimately be insurmountable, but the allegations of the Amended Complaint are sufficient to withstand the foregoing standard of a Rule 12(b)(6) motion. Defendants' Motion on this ground is DENIED.

2. The Constructive Fraud Claim

{43} Defendants assert that Nelson has failed to state a claim for constructive fraud because the Amended Complaint fails to "allege facts sufficient to show either a confidential relationship or a wrongful benefit flowing out of that [ ] confidential relationship." (Defs.' Supp. Br. 13.)

{44} "To sustain a cause of action for constructive fraud, plaintiff must allege facts and circumstances (1) which created a relationship of trust and confidence, and (2) which led up to and surrounded a transaction in which defendant allegedly took advantage of his position of trust to injure the plaintiff." *Bowlin v. Duke University*, 108 N.C. App. 145, 151, 423 S.E.2d 320, 323 (1992). Plaintiff must also allege that the defendant sought to benefit himself by his misconduct, *Burger v. McCoy Hilliard & Parks*, 346 N.C. 650, 667, 488 S.E.2d 215, 224–25 (1997), and that plaintiff was injured by that misconduct. *White v. Consolidated Planning, Inc.*,

166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004), *disc. review denied*, 359 N.C. 286, 610 S.E.2d 717 (2005).[6]

{45}  In support of Nelson's constructive fraud claim, the Amended Complaint alleges that "[a]s a result of Tweeten's position as controlling owner, and working with Nelson during the period of 2007 – 2009 in managing Alliance, Nelson developed a relationship of trust and confidence in Tweeten" (Am. Compl. ¶ 75); "Tweeten purported to unilaterally remove Nelson from the board of directors of Alliance [and] . . . . as CFO of Alliance" (Am. Compl. ¶¶ 76, 78); "Nelson requested that Alliance distribute the proceeds of the Interstate transaction in accordance with the terms of the Operating Agreement [and] . . . Tweeten and Axis have refused" (Am. Compl. ¶¶ 81–82); "Tweeten and Axis are not acting in the best interests of Alliance or Nelson, and are benefitting themselves by withholding funds that Nelson is plainly entitled to recover" (Am. Compl. ¶ 83); and "Nelson has been damaged by the constructive fraud of the Defendants in an amount to be proven at trial." (Am. Compl. ¶ 84.)

{46}  North Carolina law broadly defines a fiduciary relationship as one in which:

> there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing confidence . . . [and] 'it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.'

*Dalton v. Camp*, 353 N.C. 647, 651–52, 548 S.E.2d 704, 707–08 (2001).  The allegations of a fiduciary duty owed to Nelson by Tweeten based on a relationship of trust rest on a slender reed.  However, the Amended Complaint sufficiently alleges the existence of a fiduciary duty owed by Tweeten individually and a wrongful benefit flowing from that relationship.  Ultimately, Nelson may not be able to

---

[6] Although the contract claims arising out of the Operating Agreement are governed by Georgia law, both Plaintiff and Defendant analyze the constructive fraud and negligent misrepresentation claims as tort claims governed by North Carolina law.

support this broad claim with actual proof.  Defendants' Motion on this ground is DENIED.

### 3.  The Breach of Contract/Wrongful Termination Claim

{47}  Nelson contends that Alliance breached the implied duty of good faith and fair dealing by removing him from the board of directors and terminating his employment as Chief Financial Officer.  Defendants counter that Nelson has failed to state an employment based claim[7] because he was nothing more than an at-will employee of Alliance.  (Defs.' Supp. Br. 18.)

{48}  Although the Georgia Supreme Court has articulated the general rule that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement[,]" *Brack v. Brownlee*, 246 Ga. 818, 820 (1980), "[i]f an agreement by its express terms grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision." *Automatic Sprinkler Corp. of America v. Anderson*, 243 Ga. 897, 868–69 (1978).

{49}  The Operating Agreement contains provisions related to the election and removal of company officers.  Section 3.13 of the agreement provides that "officers . . . shall be elected by the Board of Directors and shall serve at the pleasure of the Board . . ." (Defs.' Supp. Br. Ex. B § 3.13.)  Section 3.14 grants the Board of Directors the discretion to remove any officer "with or without cause, at any time, subject to the rights, if any, of such officer under a contract of employment with the Company." (Defs.' Supp. Br. Ex. B § 3.14.)

{50}  Nelson asserts that sections 3.13 and 3.14 of the Operating Agreement impose upon Alliance a duty of good faith and fair dealing which was breached when Nelson was terminated as Chief Financial Officer and removed from the board of directors.  Nelson alleges that "[t]he Operating Agreement of Alliance is a contract" (Am. Compl. ¶ 103); "[i]n purporting to terminate the employment of

---

[7] In his papers, Plaintiff identifies this as a breach of contract claim, a wrongful termination claim, and a claim for breach of the duty of good faith and fair dealing.  The distinction is irrelevant for purposes of the Defendants' Motion as dismissal is justified irrespective of how the claim is packaged.

Nelson, and removing him from the board of directors of Alliance, Defendants have not acted in good faith [and] . . . have breached their obligations of good faith and fair dealing" (Am. Compl. ¶ 105); "[d]efendants frustrated Nelson's reasonable expectations by purporting to terminate his participation as a member of the board of directors and his position as CFO" (Am. Compl. ¶ 107); "[b]y frustrating Nelson's reasonable expectations, and by failing to act in good faith, Tweeten and Axis have breached the Operating Agreement" (Am. Compl. ¶ 108); and "Nelson has been injured as a result of Defendants' breach of the Operating Agreement in an amount to be proven at trial." (Am. Compl. ¶ 109.)

{51} To support those assertions, Nelson relies on *ULQ v. Meder*, 666 S.E.2d 713 (Ga. App. 2008). In *ULQ*, the Georgia Court of Appeals affirmed the trial court's denial of ULQ's motion for summary judgment on a former officer's breach of contract claim, finding that the power to terminate an officer was subject to the implied covenant of good faith where the language of the limited liability company's operating agreement allowed management to terminate an officer only if it was determined, in management's sole discretion, that termination served the best interest of the company. *Id.* at 716. According to the court,

> [t]he distinguishing feature of the agreement at issue . . . is that although ULQ could terminate [plaintiff] without cause, ULQ could only do so whenever in its manager's judgment the best interest of the company would be served thereby. Thus, the power was constrained or qualified; ULQ was allowed the power to terminate [plaintiff] as an officer if and only if ULQ's manager determined (on behalf of ULQ), in his discretion or judgment, that such was in the best interests of ULQ. Absent this discretionary determination, the manager and thus ULQ could not terminate an officer.

*Id.* at 717.

{52} Unlike the operating agreement at issue in *ULQ*, Alliance's Operating Agreement does not constrain or qualify the ability of the board of directors to terminate officers. Under Alliance's Operating Agreement, the board can terminate officers at any time, with or without cause, and that right is limited only to the extent that the officer is "under a contract of employment with [Alliance]." (Defs.'

Supp. Br. Ex. B § 3.14.) The pleadings do not allege the existence of a stand alone employment contract between Nelson and Alliance, and inferences necessary to support such a finding are inconsistent with the facts alleged. By the terms of the Operating Agreement, the board of directors had an unqualified and unrestrained right to terminate officers of the company at any time, with or without cause. The exercise of that right should not give rise to liability in contract.

{53} Defendants' Motion on this ground is GRANTED.

## B. Plaintiff's Motion to Dismiss

{54} Plainitff's Motion challenges the sufficiency of Defendants'/ Counterclaim-Plaintiffs' claims for negligent misrepresentation and constructive fraud under Rule 12(b)(6).

## 1. Negligent Misrepresentation

{55} Nelson contends that the Second Amended Counterclaim fails to state a claim for negligent misrepresentation because (1) the Admission Document presented to Tweeten is plain on its face, and (2) there are no allegations that Tweeten was denied the opportunity to investigate or learn what the Admission Document said before signing it.

{56} "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bakaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (internal citations omitted).

{57} To establish those elements, Counterclaim-Plaintiffs allege "Nelson supplied false information to [Axis] and [Tweeten] during the course of negotiating, drafting and executing the Admission Document . . . " (Second Am. Countercl. ¶ 60); "[Axis and Tweeten] were denied the opportunity to read or investigate the legal effect of the Admission Document, and given the urgency presented by [Nelson], [Axis and Tweeten] could not have learned the true facts by the exercise of due diligence" (Second Am. Countercl. ¶ 31); "Nelson intended that . . . Axis and Tweeten rely on [false] information" (Second Am. Countercl. ¶ 61); "Nelson failed to

exercise reasonable care or competence in obtaining or communicating this false information" (Second Am. Countercl. ¶ 62); "Axis and Tweeten reasonably relied on upon that false information" (Second Am. Countercl. ¶ 63); and "[s]uch reliance proximately caused . . . Axis and Tweeten to incur financial damage." (Second Am. Countercl. ¶ 65.)

{58} Plaintiff asserts, as a matter of law, there could have been no reasonable reliance on any statement which contradicts the plain language of the document. At the hearing on the motions, the Court expressed doubt as to whether Tweeten will be able to prove that he did not know and could not have known he was granting units rather than percentages, or the significance of granting Nelson an ownership interest of ten (10) membership units. But, the Court is required to accept the pleadings as true on a motion to dismiss under Rule 12(b)(6) and Defendants get the same benefit of the liberal standard used to allow Nelson's claims to survive notwithstanding the Court's doubt as to whether Nelson can ever prove them.

{59} As pleaded, the allegations of the Second Amended Complaint are sufficient to state a claim for negligent misrepresentation against Nelson. Plaintiff's Motion on this ground is DENIED.

## 2. Constructive Fraud

{60} Nelson contends that the Second Amended Counterclaim fails to state a claim for constructive fraud because there are no allegations that Nelson took advantage of any fiduciary relationship owed to the Defendants by presenting Tweeten with an Admission Document that is plain on its face as to the ownership interest Nelson would receive.

{61} As previously indicated, to adequately plead a claim for constructive fraud, the moving party "must allege facts and circumstances (1) which created a relationship of trust and confidence, and (2) which led up to and surrounded a transaction in which defendant allegedly took advantage of his position of trust to injure the plaintiff." *Bowlin*, 108 N.C. App. at 151, 423 S.E.2d at 323. It must also be alleged that the defendant sought to benefit himself by his misconduct, *Burger*,

346 N.C. at 667, 488 S.E.2d at 224–25, and that plaintiff was injured by that misconduct. *White*, 166 N.C. App. at 294, 603 S.E.2d at 156.

{62} To establish these elements, Counterclaim-Plaintiffs allege that "Nelson, as an officer . . . and a manager-director of . . . Alliance . . . created a relationship of trust and confidence between Nelson and Counterclaim Plaintiffs" (Second Am. Countercl. ¶ 67); "Nelson took advantage of this relationship of trust and confidence by failing to reflect the ten percent (10%) ownership interest to be acquired by Nelson in the Admission Document, by failing to disclose this omission in the Admission Document prior to presenting it to Counterclaim Plaintiff Tweeten for signature, and by failing to disclose his insolvency" (Second Am. Countercl. ¶ 68); "Axis and Tweeten were injured, and Nelson is liable to Counterclaim Plaintiffs for their actual damages" (Second Am. Countercl. ¶ 69); and "Nelson's previously-described conduct . . . was . . . committed with malice and with the intent to disrupt the businesses of Alliance and Axis for Nelson's own personal gain[.]" (Second Am. Countercl. ¶ 70.)

{63} The Court is skeptical as to whether the facts and circumstances alleged give rise to a relationship of trust and confidence between Nelson and Axis or Tweeten, and as to whether Nelson took advantage of that alleged relationship by presenting Tweeten with the Admission Document which was plain on its face as to the interest Nelson was to receive upon execution. Nevertheless, Counterclaim-Plaintiffs have alleged facts sufficient to survive dismissal pursuant to Rule 12(b)(6). Plaintiff's Motion on this ground is DENIED.

## VI. CONCLUSION

{64} Defendants' Motion with respect to the following claims is DENIED:

1)      Breach of fiduciary duty.

2)      Dissolution.

3)      Constructive fraud.

{65} Defendants' Motion with respect to Nelson's breach of contract/wrongful termination claim is GRANTED.

{66} Plaintiff's Motion is DENIED.

{67} The Parties shall submit their Case Management Report to the Court by Monday, January 9, 2012 and a Case Management Conference will be held at 9:00 a.m. on Tuesday, January 20, 2012 at the North Carolina Business Court, 225 Hillsborough Street, Third Floor, Raleigh, North Carolina 27603.

IT IS SO ORDERED, this 22nd day of November, 2011.